### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| Pennsylvania National Mutual Casualty Insurance Company, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: 2:13-cv-00920-PMD |
| v. | ) ) | **FINDINGS OF FACT** |
| Jo A. Lewis, Roger W. Lewis, and Excel Mechanical, LLC, | ) ) ) ) | **AND** **CONCLUSIONS OF LAW** |
| Defendants. | ) ) ) | |

This declaratory judgment action was tried with an advisory jury on November 17, 2014. The Court—having heard the Parties' arguments, read the submissions of counsel, and considered the evidence—now enters a declaration in favor of Defendants Jo A. Lewis ("Mrs. Lewis"), Roger W. Lewis ("Mr. Lewis") (collectively "Lewises"), and Excel Mechanical, LLC ("Excel") (collectively "Defendants") based on the following independent findings of fact and conclusions of law.

### BACKGROUND

This declaratory judgment action arises out of a case pending before this Court in Admiralty, C.A. No. 2:13-cv-00281-PMD ("Underlying Action"). The Underlying Action was filed by Mrs. Lewis against Excel and her husband, Mr. Lewis, who is Excel's sole member–manager. In the maritime tort claim that forms the basis of the Underlying Action, Mrs. Lewis alleges that on September 4, 2011, she was injured in a boating accident involving a watercraft owned and operated by Mr. Lewis. Specifically, Mrs. Lewis asserts that in attempting to ground the watercraft on a sandbar, Mr. Lewis caused a collision that trapped Mrs. Lewis's lower leg between the boat and the sandbar, resulting in serious permanent injuries. Mrs. Lewis contends

that the injuries she sustained were directly and proximately caused by Mr. Lewis's negligence and gross negligence. Particularly relevant for purposes of this action is Mrs. Lewis's allegation that at the time of the accident "there were two other passengers on the Boat whom [Mr.] Lewis was entertaining as business prospects of Excel; therefore, at the time, [Mr.] Lewis was engaged in the conduct of Excel's business." (Mrs. Lewis's Compl. ¶ 12, ECF No. 1). In light of this purported business purpose of the Trip, Mrs. Lewis, who seeks actual and punitive damages, asserts that Excel is vicariously liable for Mr. Lewis's actions under the theory of *respondeat superior*.

On April 8, 2013, Plaintiff Pennsylvania National Mutual Casualty Insurance Company ("Penn National") commenced this action in the Court's diversity jurisdiction seeking a declaration of the rights and obligations of the Parties under a commercial general liability policy of insurance issued by Penn National to Excel.[1] More particularly, Penn National seeks a declaration that: (1) at the time of the accident, Mr. Lewis "was operating the Boat for personal pleasure and was not operating the Boat or acting within the course and scope of his employment by Excel, his duties for Excel, or with respect to the conduct of Excel's business"; (2) the policy in question does not provide coverage for the injuries allegedly caused by Mr. Lewis; and (3) Penn National does not have a duty to defend Excel or Mr. Lewis in the Underlying Action. (Compl. 5–6, ECF No. 1). Mr. Lewis and Excel subsequently asserted a counterclaim against Penn National for breach of contract. In their counterclaim, Mr. Lewis and Excel allege that Penn National breached the terms of the policy by failing to uphold its duty to defend the insured against any suit seeking damages. Accordingly, Mr. Lewis and Excel request an award of attorney's fees and costs.

___

1. Penn National initially moved to intervene in the Underlying Action pursuant to Rule 24 of the Federal Rules of Civil Procedure; however, following a hearing on the matter, the Court denied Penn National's request by written Order dated July 16, 2013.

Mrs. Lewis filed a Motion for Summary Judgment on February 19, 2014, requesting a declaration that the policy issued by Penn National to Excel provides coverage for her claims in the Underlying Action. Penn National filed a Response in Opposition on March 10, 2014, and Mrs. Lewis filed a Reply on March 18, 2014. On June 16, 2014, the Court denied Mrs. Lewis's Motion for Summary Judgment. In doing so, the Court concluded that determining whether Mr. Lewis was engaged in the conduct of Excel's business or was acting with respect to his duty as a manager of Excel at the time of the accident required weighing the evidence in the record and making credibility determinations regarding witness testimony—neither of which are appropriate endeavors at the summary judgment stage.

On June 20, 2014, the Court granted Penn National's unopposed Motion to Expedite and for a Speedy Trial, in which Penn National requested that the instant declaratory judgment action be tried before the Underlying Action. Accordingly, this matter was scheduled for a bench trial on July 24, 2014. However, given the factual issues and credibility determinations involved in this case, *see Wooten v. Lightburn*, 579 F. Supp. 2d 769, 771 (W.D. Va. 2008), *aff'd*, 350 F. App'x 812 (4th Cir. 2009), the Court informed the Parties in advance of trial that it was considering empanelling an advisory jury pursuant to Rule 39(c) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 39(c) ("In an action not triable of right by a jury, the court, on motion or on its own: (1) may try any issue with an advisory jury . . . ."). The Court held a telephone status conference on July 24, 2014, to discuss this issue with the Parties and to entertain any objections. Shortly thereafter, on July 28, 2014, the Parties filed separate pretrial memoranda indicating their consent to the Court empanelling an advisory jury. (ECF Nos. 45, 46, 47).[2]

---

2. Additionally, as instructed during the July 24, 2014 telephone status conference, the Parties included their respective proposals as to the phrasing of the questions or interrogatories to be presented to the advisory jury. While the Parties framed the issues in a similar fashion—largely mirroring the relevant Policy language—their proposals

The Court conducted jury selection on November 6, 2014, and this matter proceeded to trial. On November 17, 2014, following a full day of argument, evidence, and testimony, the Court instructed the advisory jury and presented the eight-member panel with a special verdict form for its consideration. The Court's verdict form set forth precise questions for the advisory jury to answer based on the preponderance of the evidence and in accordance with the Court's instructions.[3] The questions presented to the advisory jury read *in toto* as follows:

1.  Do you, the Jury, unanimously find that Roger Lewis engaged in any activities with respect to *the conduct of Excel Mechanical's business* during the boat trip on which Jo A. Lewis was injured?

    Yes  _____
    No   _____

2.  Do you, the Jury, unanimously find that Roger Lewis engaged in any activities with respect to *his duties as Excel Mechanical's manager* during the boat trip on which Jo A. Lewis was injured?

    Yes  _____
    No   _____

(Advisory Jury Verdict, ECF No. 58). After deliberating, the advisory jury unanimously answered both questions in the affirmative. (*Id.*).

Notwithstanding the findings rendered by the duly qualified, representative, and attentive members of the advisory jury, it remains the Court's responsibility to find the facts as it deems appropriate in light of the evidence presented at trial. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury *or with an advisory jury,* the court must find the facts specially and state its conclusions of law separately." (emphasis added)). Indeed, "[i]t is well established that '[t]he Federal Rule 52(a) requirement that the trial court find the facts specially and state

---

differed slightly in terms of clarity. Without objection from Penn National, the Court adopted the phrasing proposed by Defendants.
3.    "This court is aware that instructions given to an advisory jury are not subject to review on appeal. Nevertheless, the instructions given in the instant case indicate the court's application at trial of the law of burden of proof." *Saunders v. Hercules, Inc.*, 510 F. Supp. 1137, 1142 n.5 (W.D. Va. 1981).

separately its conclusions of law is mandatory and must be fairly observed by district judges.'" *Schwartz v. Rent A Wreck Am. Inc.*, 468 F. App'x 238, 246 (4th Cir. 2012) (second alteration in original) (quoting 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2574 (3d ed. 2008)). Nevertheless, to comply with Rule 52(a)'s mandate, the Court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten*, 579 F. Supp. 2d at 772 (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment).

On December 8, 2014, the Parties submitted proposed findings of fact and conclusions of law to the Court pursuant to Rule 7.10 of the Local Civil Rules (D.S.C.). Additionally, the Court invited and received briefs from the Parties on the role of the advisory jury, the effect of the advisory jury's findings, and what, if any, consideration the Court should afford the advisory jury's verdict in independently finding the facts and reaching its own conclusions of law. The Court has carefully reviewed and considered the Parties' arguments in the context of determining whether to accept and adopt the advisory jury's verdict.

## **FINDINGS OF FACT**

After considering the evidence and testimony presented at trial, personally observing the demeanor and credibility of the witnesses, and making all reasonable inferences to be drawn therefrom in accordance with the Federal Rules of Evidence, the Court finds that the following specific facts have been established by a preponderance of the evidence.[4]

1.     Penn National is a Pennsylvania corporation authorized to write and issue insurance policies in the State of South Carolina.

---

4.     "To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded." *Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, No. 4:09-CV-1379-RBH, 2013 WL 5437712, at *1 (D.S.C. Sept. 27, 2013).

2.  Mrs. Lewis is a citizen and resident of Summerville, South Carolina.  She is the wife of Mr. Lewis.

3.  Mr. Lewis is a citizen and resident of Summerville, South Carolina.  He is the husband of Mrs. Lewis.

4.  Excel is a South Carolina limited liability company with its principal place of business in Summerville, South Carolina.  Mr. Lewis is the sole member and manager of Excel and, at the time of the accident, was also Excel's only employee.

5.  Penn National issued commercial general liability policy number AC9 0670067 ("Policy") to Excel for the policy period of January 25, 2011, through January 25, 2012.  The Policy attached to Penn National's Complaint, and admitted at trial as Penn National's Exhibit No. 1, represents a true and accurate copy of the Policy.

6.  The named insured listed in the Policy's declarations is "Excel Mechanical, LLC."  The Policy specifically defines "insured."  According to the terms of the Policy, if the named insured is "[a] limited liability company, you are an insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers."  (ECF No. 1-1, at 25).  The Policy does not further define the phrases "conduct of your business" or "duties as your managers."

7.  The Policy provides liability coverage for, *inter alia*, "bodily injury" caused by an "occurrence," which the Policy defines in relevant part as "an accident."  (*Id.* at 31).

8.  The Policy also includes coverage for bodily injury resulting from an accident arising from the use of a watercraft not owned by the named insured, provided that the watercraft is "[l]ess than 51 feet long" and is "[n]ot being used to carry persons or property for a charge." (*Id.* at 44).

6

9.	The Policy further provides that "[Penn National] will have the right and duty to defend the insured against any 'suit' seeking . . . damages [to which coverage applies]." (*Id.* at 17).

10.	On September 4, 2011, Mr. Lewis was operating a watercraft that he owned ("Boat") in or near the Charleston Harbor ("Trip").

11.	During the course of the Trip, Mrs. Lewis sustained bodily injuries as a result of an accident or collision ("Accident"). More specifically, Mrs. Lewis alleges in the Underlying Action—and Penn National does not dispute, at least for purposes of the present action—that in attempting to ground the Boat on a sandbar, Mr. Lewis caused the Accident, trapping Mrs. Lewis's lower leg between the Boat and the sandbar.

12.	The Policy was in effect at the time of the Trip, and the Boat, which was less than fifty-one feet in length, was not being used to transport people or property for a fee. Thus, the sole issue in this declaratory judgment action is whether Mr. Lewis was an insured under the Policy at the time of the Trip and the resulting Accident. Stated otherwise, the inquiry is whether Mr. Lewis was acting or engaged in any activities "with respect to the conduct of [Excel's] business" or "with respect to [his] duties as [Excel's] manager." (*Id.* at 25).

13.	Excel is in the business of selling, installing, repairing, and maintaining heating and cooling systems in residential and commercial settings.

14.	At the time of the Trip, Mr. Lewis was solely responsible for all aspects of Excel, including marketing Excel's products and services. As a small business, Excel's marketing efforts included distributing fliers, advertising in newspapers, and establishing personal relationships with local residents who may refer customers to Excel or who may themselves become customers of Excel.

7

15. One way Mr. Lewis has developed personal relationships with potential customers or sources of business for Excel is by entertaining them on the Boat. Although Mr. Lewis did not own a watercraft when he obtained the Policy, he subsequently purchased the Boat to use both for recreation and for entertaining current and prospective clients. Prior to the Trip, Mr. Lewis had used the Boat on other occasions to entertain individuals who became customers or otherwise referred business to Excel. In particular, Mr. Lewis testified that he had previously entertained the Crowley and Franzen families on the Boat and that these excursions ultimately generated or otherwise led to a significant amount of business for Excel. This testimony was bolstered by similar testimony from Mrs. Lewis and their daughter, Nadia Lewis Dunbar ("Nadia").

16. In his testimony, Mr. Lewis specifically discussed his role with Excel and its marketing efforts with the Boat. He explained that although he and his family derived pleasure from the Boat, it was often used to treat clients and potential clients to family outings in an effort to generate goodwill and cultivate personal relationships that would hopefully lead to business for Excel. Mr. Lewis testified that Excel often covered the various costs associated with using the Boat to entertain current and prospective clients—such as fuel, food, and ice—but that he would not prevent a customer or potential customer from contributing to the cost of the outing if he or she insisted or felt so inclined.

17. Fuel costs for business outings were generally paid for using a company credit card. Mr. Lewis used a CPA to guide him on appropriate tax deductions for Excel, and all business deductions for the Boat and other aspects of Excel were approved by the CPA before filing tax returns.

18. Mr. Lewis testified that he uses "Quickbooks" accounting software to track Excel's business expenses and that he manually enters all of Excel's transactions into the software based on credit-card receipts. If no receipt is available, he enters the transaction based on monthly credit-card statements. If he pays a business expense with cash, he typically saves the cash receipt and reimburses himself later.

19. Mr. Lewis further testified that when he fuels the Boat, the method of payment generally depends on the anticipated use of the Boat. His typical company practice was and is to use a credit card to purchase gas for the Boat if it is being used for Excel's purposes. If the Boat is used to entertain customers or prospective customers, Excel either pays the costs directly using a company credit card or Mr. Lewis keeps the receipts and Excel reimburses him for those costs at a later date. If the Boat is used for personal use, Mr. Lewis does not expense it through Excel.

20. On the date of the Trip and Accident, Mr. Lewis's use of the Boat involved taking Larry and Joni Nuckels (collectively "Nuckelses") for a sightseeing and picnic-type excursion.

21. At the time of the Trip, the Nuckelses lived in the same neighborhood as the Lewises and were members of the same Jehovah's Witness Kingdom Hall congregation as the Lewises.

22. In addition to the Lewises and the Nuckelses, the other passengers on the Boat were the Lewises' daughters, Nadia and Cheyenne Lewis Columbo, and a friend of the Lewises' daughters, Alexa Martinez.

23. The evidence established that Excel provided the gas—and, to the extent it was purchased, some of the food and drinks—for this Trip. Mr. Lewis testified that he did not recall fueling the Boat on the date of the Trip. Instead, he referred to fuel receipts, which showed that he refueled the Boat at an Exxon in Moncks Corner on the weekend before the Trip. He

9

compared the receipt with his business records, which also showed a fuel purchase one week before the Trip at the gas station he typically uses to refuel the Boat. Mr. Lewis testified that he does not normally use an entire tank of gas when operating the Boat.

24. Prior to and after the Trip, Excel sent out fliers within the neighborhood; in response to receiving one of the fliers, the Nuckelses had contacted Mr. Lewis and told him that they would consider Excel if they had any HVAC needs.

25. Mr. Lewis—whose state of mind is the only direct evidence of whether the Trip involved or was related to any business purpose of Excel—testified that he viewed the Nuckelses as potential customers or sources of business. Mr. Lewis testified that even though he knew the Nuckelses through the neighborhood and the local church congregation, he wanted to build a stronger personal relationship with them so that they would consider him for their HVAC needs and refer other potential customers to him as well.

26. Mr. Lewis testified that while the Nuckelses were potential customers at the time of Trip, they have since sought estimates from Excel for work at their home and referred other prospective customers to Excel. Thus, Mr. Lewis's cultivation of a relationship with the Nuckelses has generated business for Excel.

27. The Court does not find persuasive the testimony elicited by Penn National that only Mr. Lewis was aware of any business purpose of the Trip. In particular, Penn National sought to establish through the testimony of Mr. Lewis, Mrs. Lewis, Nadia, and Mr. Nuckels that only Mr. Lewis knew of this Trip's business-related purpose. Mr. Lewis testified that he did not believe that informing customers and potential customers that he was seeking to court their business was an appropriate or professional marketing technique and, thus, he refrained from doing so. Mrs. Lewis and Nadia testified that they were not involved in any aspect of Excel at

that time and that they would not have known of a business-related purpose or aspect of the Trip. Mr. Nuckels said that he was unaware of any such purpose but that he was neither surprised nor offended to learn of it after the Trip.

28.     Penn National also attempted to establish at trial that Mr. Lewis's approximately six-month delay in reporting and filing a claim regarding the Accident was evidence that he did not believe the Trip was business related.  However, the Court finds, based on the testimony and evidence in the record, that this delay is more properly attributed to the fact that Mr. Lewis did not learn of the Policy's watercraft coverage until he received and reviewed a copy of the Policy in the course of filing an unrelated claim under the Policy.

29.     Based on the entirety of the testimony and evidence, the Court finds that Mr. Lewis and Excel made legitimate efforts to use the Boat for business purposes and to ensure that the costs associated with entertaining current and prospective customers on the Boat were properly noted as business expenses.  In so finding, the Court is mindful of the cross-examination testimony elicited from Mr. Lewis by Penn National's counsel regarding apparent irregularities in Excel's general ledger.  Although there may be questions regarding certain entries in the ledger, the Court finds Mr. Lewis's testimony credible and convincing as it relates to the intent of Excel's only member–manager to use the Boat for business purposes.

30.     In sum, in resolving what amounts to essentially a credibility contest, the Court finds Mr. Lewis's testimony in this regard, as well as his actions related to the Policy more generally, to be both reasonable and believable.  Moreover, Mr. Lewis's presentation and demeanor on the witness stand at trial also suggests and supports the credibility of his testimony. Further, the Court finds that Mr. Lewis's description of the business purpose of the Trip is consistent with his prior use of the Boat in connection with Excel's marketing efforts.

31.    For the foregoing reasons, the Court finds that at the time of the Trip and the resulting Accident, Mr. Lewis was acting or engaged in activities in furtherance of and with respect to the conduct of Excel's business and his duties as Excel's manager.

## CONCLUSIONS OF LAW

1.    This action is brought under the provisions of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* and Rule 57 of the Federal Rules of Civil Procedure.

2.    Penn National has asked this Court to inquire into and declare the rights and obligations of the Parties arising out of the facts set forth above, and the Court finds that this matter presents a real and justiciable controversy.  "The court's power to issue its declaration regarding the rights and obligations of parties as to insurance coverage or other issues lays within the court's discretion." *Builders Mut. Ins. Co. v. Wingard Props., Inc.*, No. 4:09-532-RBH-SVH, 2010 WL 3069544, at *5 (D.S.C. July 1, 2010) (citing *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996)), *report and recommendation adopted*, No. 4:09-CV-00532-RBH, 2010 WL 3069513 (D.S.C. Aug. 3, 2010).

3.    The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship among the Parties; therefore, this Court has jurisdiction to hear this matter under 28 U.S.C. § 1332(a)(1).

4.    "When . . . a jury trial is waived, the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts.  The court may select among conflicting inferences to be drawn from the testimony." *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987) (citations omitted).  If the trial judge's account of the evidence is plausible in view of the record as a whole, the court of appeals may not reverse the trial court's determination even if it would have weighed the evidence differently. *Anderson v. Bessemer City*, 470 U.S. 564, 574

(1985); *see* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)). The reviewing court "must give due regard to the opportunity of the district court to judge the credibility of the witnesses." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable*, 65 F.3d 1113, 1122 (4th Cir. 1995). As the Supreme Court has reasoned, "the trial on the merits should be the main event . . . rather than a tryout on the road." *Anderson*, 470 U.S. at 575 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)) (internal quotation marks omitted).

        5.      Under Rule 52(a), the trial court may properly treat issues related to a party's intent, purpose, or knowledge as questions of fact. *See Pullman–Standard v. Swint*, 456 U.S. 273, 288 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace."); *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 751 (4th Cir. 1986) ("Issues of intent are included in the factual matters for the trier of fact to discern."); *see also Cadle Co. v. Berkeley Plaza Assocs.*, 215 F.3d 1317, at *3 (4th Cir. May 17, 2000) (per curiam) (unpublished table opinion) ("Of course, resolution of this issue turns upon the intent of [the defendant] in sending the letters. 'If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact.'" (quoting *Atalla v. Abdul-Baki*, 976 F.2d 189, 192 (4th Cir. 1992))). "It surely does not stretch the language of the Rule [52(a)] to characterize an inquiry into what a person knew at a given point in time as a question of 'fact.'" *Bose Corp. v. Consumers Union of U.S., Inc*., 466 U.S. 485, 498 (1984) (holding that district court's determination regarding a party's actual knowledge

13

of the falsity of a published statement constituted a determination of fact entitled to Rule 52(a) deference).

6. Because this action falls under the diversity jurisdiction granted to the federal courts by 28 U.S.C. § 1332, the Court looks to the law of South Carolina to determine the standards by which to evaluate the Policy. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 498 (1941); *Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1299 (4th Cir. 1983). If the South Carolina Supreme Court has not addressed a particular legal issue raised in this case, this Court must predict how that court would rule if presented with the issue. *Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005). In making that prediction, the Court will "consider lower court opinions in South Carolina, the teachings of treatises, and the practices of other states." *Id.* (internal quotation marks omitted).

7. According to South Carolina law, "[a] contract of insurance is governed by the law of the state in which application for insurance was made, the policy delivered, and the contract formed." *Unisun Ins. Co. v. Hertz Rental Corp.*, 436 S.E.2d 182, 184 (S.C. Ct. App. 1993) (citing *Barkley v. Intern. Mut. Ins. Co.*, 86 S.E.2d 602 (S.C. 1955)). Pursuant to *Unisun* and its progeny, as well as section 38-61-10 of the South Carolina Code of Laws, South Carolina law applies to this matter. *Heslin-Kim v. CIGNA Grp. Ins.*, 377 F. Supp. 2d 527, 530–33 (D.S.C. 2005). Additionally, the Parties have neither objected to the application of South Carolina law nor suggested that the law of another state should govern.

8. Under South Carolina law, insurance policies are subject to the general rules of contract construction. *M&M Corp. of S.C. v. Auto-Owners Ins. Co.*, 701 S.E.2d 33, 35 (S.C. 2010). "When a contract is unambiguous, clear, and explicit, it must be construed according to

14

the terms the parties have used." *B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999). The court must enforce, rather than write, contracts of insurance and must give policy language its plain, ordinary, and popular meaning. *Auto-Owners Ins. Co. v. Rhodes*, 748 S.E.2d 781, 789 (S.C. 2013) (quoting *USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 797 (S.C. 2008)). "[I]n construing an insurance contract, all of its provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity." *Yarborough v. Phx. Mut. Life Ins. Co.*, 225 S.E.2d 344, 348 (S.C. 1976); *see also Investors Title Ins. Co. v. Bair*, No. C.A. 9:05-1434-PMD, 2007 WL 6738625, at *6 (D.S.C. Apr. 26, 2007) ("Courts are not authorized to pervert policy language or to exercise inventive powers in order to create an ambiguity where none exists." (citing *Stewart v. State Farm Mut. Auto. Ins. Co*., 533 S.E.2d 597 (S.C. Ct. App. 2000))), *aff'd*, 296 F. App'x 332 (4th Cir. 2008). "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (S.C. Ct. App. 1997). "Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted." *Poston v. Nat'l Fid. Life Ins. Co.*, 399 S.E.2d 770, 772 (S.C. 1990).

9.     An insurer's obligation under a policy of insurance is defined by the terms of the policy itself and cannot be enlarged by judicial construction. *S.C. Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. Ct. App. 1990). A policy clause extending coverage must be liberally construed in favor of coverage, while insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability.

15

*M&M Corp. of S.C.*, 701 S.E.2d at 35; *Owners Ins. Co. v. Clayton*, 614 S.E.2d 611, 614 (S.C. 2005). "However, if the intention of the parties is clear, courts have no authority to torture the meaning of policy language to extend coverage that was never intended by the parties." *S.C. Farm Bureau Mut. Ins. Co. v. Wilson*, 544 S.E.2d 848, 850 (S.C. Ct. App. 2001).

10. "It is axiomatic that an entity seeking coverage under a policy of insurance bears the burden of proving that the claims alleged against it and the damages paid fall within the grant of coverage provided by that policy." *Crossmann Cmtys. of N.C., Inc.*, 2013 WL 5437712, at *15 (collecting cases); *see also Auto-Owners Ins. Co. v. Newsome*, No. 4:12-CV-00447-RBH, 2013 WL 5797729, at *8 (D.S.C. Oct. 25, 2013) (footnote omitted) ("It is the insured's burden to establish that a claim falls within the coverage of an insurance contract." (citing *Jensen v. Selective Ins. Co. of Se.*, No. 4:12–cv–02133–RBH, 2013 WL 3148341, at *2 (D.S.C. June 19, 2013))). The Court concludes that Excel and Mr. Lewis have carried their burden of demonstrating that the claims alleged in the Underlying Action fall within the scope of the coverage provided by the Policy.

11. The Court also concludes that the terms of the Policy are unambiguous. *See, e.g.*, *Nationwide Ins. Co. of Am. v. Calabrese*, No. 13-CIV-81145, 2014 WL 7185467, at *6 (S.D. Fla. Dec. 16, 2014) ("Indeed, courts in and outside Florida have found the phrase 'with respect to the conduct of a business' facially unambiguous."); *Motorists Mut. Ins. Co. v. Cianfaglione*, 2014-Ohio-2885, ¶ 33 (concluding that nearly identical policy language was not ambiguous and "must be given its 'natural and commonly accepted meaning'" (quoting *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982))). The operative language of the Policy is within the scope of common understanding and usage. Additionally, it is commonly understood that when limited liability companies or other business entities rely on individuals for business and

16

referrals, efforts to establish relationships with prospective customers and to maintain those relationships with existing customers are activities "with respect to" the company's business. Similarly, it is consistent with common understanding that managers of companies will play an active role in the establishment, cultivation, and development of customer and referral relationships.

12. Having considered the evidence and testimony presented at trial, and based on the weight of the evidence and the credibility of the Parties and witnesses, the Court concludes that at the time of the Trip and the resulting Accident, Mr. Lewis was operating the Boat in the course of his employment and with respect to the conduct of Excel's business and his duties as the manager of Excel. *See Auto-Owners Ins. Co. v. Newsome*, No. 4:12-CV-00447-RBH, 2013 WL 5797729, at *5 n.9 (D.S.C. Oct. 25, 2013) (explaining that determining whether an employee "was in the course of his employment and whether [the employee] was performing duties related to the conduct of the business require essentially the same showing"). "In determining whether an employee is acting in the course of employment, South Carolina courts generally ask whether a servant is doing some act in furtherance of the master's business." *Id.* at *8 (quoting *S.C. State Budget & Control Bd., Div. of Gen. Serv., Ins. Reserve Fund v. Prince*, 403 S.E.2d 643, 646 (S.C. 1991)) (internal quotation marks omitted); *see also Auto Owners Ins. Co. v. Pers. Touch Med Spa, LLC*, 763 F. Supp. 2d 769, 782 (D.S.C. 2011) (applying same test under South Carolina law), *on reconsideration in part,* No. 4:10-CV-683-TLW, 2011 WL 4962917 (D.S.C. Oct. 18, 2011). The overwhelming weight of the evidence supports the proposition that the Trip was in furtherance of Excel's business—namely, developing and cultivating relationships with potential customers and referral sources. The fact that the Trip included or may have included elements of familial entertainment and friendly fellowship does not deprive the Trip of its

business purpose. *See Bechen v. Am. Guar. & Liab. Ins. Co.*, 298 F. Supp. 2d 806, 810–11 (W.D. Wis. 2003); *see also In re Antill Pipeline Const. Co.*, No. CIV.A. 09-3646, 2011 WL 577352, at *3 (E.D. La. Feb. 7, 2011) (noting that under Louisiana law "the intent of a business in paying for a recreation activity does not in itself create vicarious liability. Rather the relevant questions are how [the employee] used the boat in practice and what motivated [the employee] in using his boat on the night in question." (citation omitted) (citing *Richard v. Hall*, 874 So. 2d 131, 140 (La. 2004))).

13.     Because the Court, like the advisory jury, finds that Mr. Lewis's actions were in furtherance of and with respect to the conduct of Excel's business and his duties as Excel's manager, the Court concludes that Mr. Lewis was an "insured" under the terms of the Policy at the time of the Trip and the resulting Accident. Therefore, without reaching or deciding the merits of the Underlying Action, the Court concludes and declares that the Policy's liability coverage applies to Mrs. Lewis's claims against Mr. Lewis and Excel in the Underlying Action. Accordingly, under the terms of the Policy, Penn National has a duty to indemnify Excel, Mr. Lewis, or both, in the event that a judgment is rendered against one or both of them in the Underlying Action. Further, Penn National also has a duty under the terms of the Policy to defend Excel and Mr. Lewis in the Underlying Action. *See generally Auto Owners Ins. Co.*, 763 F. Supp. 2d at 777 (providing an overview of South Carolina law regarding insurance coverage and the duty to defend).

14.     Finally, with respect to Mr. Lewis and Excel's counterclaim for breach of contract, the Court concludes that there is not sufficient evidence in the record to decide the issue of costs and attorney's fees. Although Mr. Lewis and Excel's proposed findings of fact and conclusions of law were accompanied by an Affidavit of Attorney's Fees, this document was not

made a part of the record in this action. Accordingly, to the extent Mr. Lewis and Excel wish for this Court to reach and decide the merits of their counterclaim, either by way of supplemental findings of fact and conclusions of law or otherwise, counsel shall present and supplement the record with any and all evidence and arguments it would like the Court to consider.

## CONCLUSION

For the foregoing reasons, it is **DECLARED** that at the time of the Trip and the resulting Accident, Mr. Lewis was acting with respect to the conduct of Excel's business and his duties as Excel's manager; that the Policy provides liability coverage applicable to Mrs. Lewis's claims in the Underlying Action; and that Penn National has a duty to defend Excel and Mr. Lewis in the Underlying Action.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**April 30, 2015**
**Charleston, South Carolina**